Brian S. King, #4610
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1732
Facsimile: (801) 532-1936
brian@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LYN M., and DAVID M., as Legal Guardians of L.M., a minor,<br><br>        Plaintiffs,<br><br>vs.<br><br>PREMERA BLUE CROSS, and MICROSOFT CORPORATION WELFARE PLAN,<br><br>        Defendants. | COMPLAINT<br><br>Civil No. 2:17-cv-01152-BSJ |

Plaintiffs Lyn M. ("Lyn"), David M. ("David"), and L.M., collectively known as "Plaintiffs" or "M. family", through their undersigned counsel, complain and allege against Defendants Premera Blue Cross ("Premera") and Microsoft Corporation Welfare Plan ("the Plan") as follows.

**PARTIES, JURISDICTION AND VENUE**

1. Lyn, David, and L.M. are natural persons residing in New York County, New York. Lyn is L.M.'s mother, David is L.M.'s father.

1

2. Microsoft Corporation ("Microsoft") is a corporation doing business in the State of Utah. Microsoft is the Plan administrator. Premera is the claim administrator of the Plan.

3. Microsoft is a corporation with its headquarters in Washington. During the relevant time frame, Microsoft was David's employer.

4. The Plan is a self-funded group health benefit plan sponsored by Microsoft for its employees and their dependents. David was a participant in the Plan and L.M. was a beneficiary of the Plan.

5. The Plan is an employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

6. L.M. received medical care and treatment in the State of Utah at Eva Carlston Academy Residential Treatment Center ("Eva Carlston"), a residential treatment facility providing mental health care to adolescent girls.

7. Premera and the Plan denied some of L.M.'s claims for payment of her medical expenses in connection with her treatment at Eva Carlston. This lawsuit is brought to obtain this Court's order requiring the Plan to pay L.M.'s unpaid expenses incurred during her treatment at Eva Carlston.

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the Premera, the Plan administrator, and Microsoft, the Plan sponsor, reside or may be found in Utah. This is true, among other reasons, because under ERISA's nationwide service of process provision, personal jurisdiction in Utah

for those two corporations is proper. In addition, the medical treatment at issue in this case was provided in the State of Utah and the financial obligations of the Defendants to L.M.'s healthcare providers were incurred in the state of Utah. Moreover, as between the other choices for venue that have a logical relationship to this case, Utah is not any less convenient for the parties than either New York or Washington. Finally, the Plaintiffs wish to maximize the likelihood that the sensitive nature of the mental health treatment provided for L.M. will not become publicly known and believe the likelihood of maintaining her privacy is increased by bringing their claim in Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## BACKGROUND FACTS

### L.M.'s Developmental and Medical Background

11. As a toddler, L.M. was shy and did not have many friends.

12. In elementary school, L.M. tested into the gifted program, but did not work to her full potential. L.M. began exhibiting signs of anxiety and panic attacks early on, and has been in therapy since roughly age 8.

13. In first grade, L.M. asked to be tested for dyslexia. L.M. exhibited social awkwardness and anxiety.

14. In second grade, L.M. exhibited difficulties in separating theory from reality. This was demonstrated in various scenarios, including when she learned about weather

and tornadoes in school, and was then convinced that she and her family needed to sleep in closets for safety.

15. While still in second grade, L.M. began treatment with Dr. Lisa Huber, a psychiatrist, and Betsy Craig, L.C.S.W.

16. In sixth grade, L.M. was transferred to a small private school. She underwent a full battery of psycho-educational tests, was found to have an extremely high I.Q., was diagnosed with Attention Deficit Hyperactive Disorder ("ADHD"), and was diagnosed with a mild non-verbal learning disability.

17. During middle school, L.M. struggled to stay awake in classes, had deteriorating school performance, and continued to withdraw from friendships and family activities. L.M. spent most of her time in her room, and her hygiene and behavior significantly declined.

18. L.M. was then transferred to a school which catered to brighter children with difficulty functioning in a traditional school setting. L.M. began self harm by cutting her upper thighs and wrist.

19. In eighth grade, L.M. began refusing to leave her room, and attended public school for two weeks before having to be placed in the school's homebound program for students who could not physically attend school for various reasons including physical or mental illness.

20. L.M. continued to be treated by Dr. Huber and Betsy Craig throughout her adolescence. L.M. completed two Dialectical Behavior Training ("DBT") modules, and after a lengthy session with Betsy Craig, Lyn was advised to take

L.M. to Ridgeview Institute and to place L.M. under suicide watch. Ridgeview Institute is a mental health facility in Atlanta, Georgia.

21. L.M. has demonstrated suicidal ideations since age nine, with various plans to commit suicide, including self hanging, overdosing on pills, and stepping in front of a subway train.

22. It was clear to L.M.'s treating providers that outpatient and DBT sessions were ineffective. At the advice of Betsy Craig, L.M. was admitted to Eva Carlston.

### L.M.'s Treatment at Eva Carlston

23. At the recommendation of L.M.'s treating physicians, L.M. was admitted to Eva Carlston on March 21, 2015.

24. At the time of her admission to Eva Carlston, L.M. was diagnosed as follows:

> DSM-V:   -Major Depressive Disorder Severe Without Psychotic Features
> -Unspecified Anxiety Disorder
> -ADHD Inattentive Type
> -Unspecified Neurodevelopmental Disorder Consistent with Mild Non-Verbal Learning Disorder
> -Rule Out Generalized Anxiety Disorder
> -Rule Out Social Disorder
> -Rule Out Obsessive Compulsive Disorder

25. L.M. struggled with the residential treatment program at first, but despite her feelings, she committed to her treatment plan. Her medical records documented frequent declines in progress but L.M.s condition slowly improved.

26. L.M.'s Discharge Evaluation shows that she improved while at Eva Carlston. Her discharge diagnosis was as follows:

> DSM-V:   -Unspecified Neurodevelopmental Disorder Consistent with Mild Non-Verbal Learning Disorder

>       -Major Depressive Disorder, Full Remission
>       -Attention-Deficit/Hyperactivity Disorder,
>       Predominantly Inattentive Presentation
>       -Generalized Anxiety Disorder

27. According to the Discharge Summary, L.M. completed her treatment plan at Eva Carlston. The Discharge Plan recommended continued individual therapy, family therapy, therapeutic boarding school, and medication management services for L.M..

**The Plan's Denial of Coverage and the M. Family's Appeal**

28. Claims were submitted to Premera and coverage for treatment was approved through March 31, 2015. However, claims after March 31, 2015 were denied.

29. In the Stage 1 Denial letter from Premera, dated March 31, 2015, Premera states:

> The information that your provider gave to your health plan shows that the psychiatrist in charge of your treatment evaluates you in-person once a month, not once every seven days. The information also shows that you are receiving individual therapy every other week, not weekly. Therefore, mental health residential treatment is denied as not medically necessary after 3/30/15. Your health plan covers only medically necessary services.

30. Lyn appealed the denial of coverage on April 19, 2016. In her appeal, Lyn provided a detailed history for L.M. and included records from Eva Carlston which demonstrated the medical necessity of L.M.'s treatment.

31. Lyn argued that Premera had approved L.M.'s treatment for the first 11 days. Had Premera determined that Eva Carlston did not meet residential treatment criteria, those claims would not have been paid.

32. Premera maintained the denial on behalf of the Plan in a letter dated June 3, 2016. The denial letter, in its entirety, contained two and a half pages of text and two pages of appeal application paperwork. The denial letter stated in part:

    > The denial of benefits stating residential treatment center services from March 31, 2015 and onward are not medically necessary is accurate. This decision was based on the plan, which specifically excludes benefits for services or supplies that are not medically necessary.
    >
    > After review of L.M.'s medical records, the inpatient residential treatment level of care from March 31, 2015 onward is not medically necessary. … The documentation does not indicate that L.M. continued to experience severe mental health symptoms requiring 24-hour residential treatment as of April 1, 2015. This is because there was no documented evidence of ongoing suicidal or homicidal ideation, self-injury, psychosis, or severe difficulties in self-care. …
    >
    > We would also like to address the reasoning behind coverage being provided from March 20-30, 2015. Premera received notice of L.M.'s admission on March 20, 2015; however, due to internal delays the request was not fully processed until March 30, 2015. We felt that L.M. should not be penalized for the internal delay so the initial 10 days of L.M.'s stay were authorized. These days were not approved based on being medically necessary.

33. Lyn requested an independent review through the required IRO Form, as well as an Independent Review Appeal, which was dated September 27, 2016.

34. Lyn argued that the payment of the initial eleven days due to Premera's administrative delays, should be applied to the remainder of L.M.'s treatment, as it was Premera's own internal issue.

35. Lyn also argued that Premera appeared to be grasping at new reasons for denial in each of its denial letters, without providing Lyn with an explanation of what symptoms or treatment L.M. would need for her treatment to be determined medically necessary.

36. Premera upheld its denial in a letter from the independent reviewing organization, National Medical Reviews ("NMR").

37. NMR's letter stated that the denial was being upheld on the basis of medical necessity. The letter stated in part:

> Based on a comprehensive review of the clinical findings provided with this member's case, the requested service of mental health residential treatment from 04/01/15 was not supported as medically necessary for the treatment of the member's condition.
> …In addition to no evidence with regard to risk of harm to self or others, the member presented with no biomedical concerns requiring 24-hour supervised care. Additionally, there was no indication of any other acute psychosis or difficulties related to activities of daily living aside from the member being unable to attend schooling due to anxiety-related symptoms. However, documentation reflects that the member was attending schooling on an online, homebound program.
>
> …In summary, it is the determination of this reviewer to uphold in whole the health plan's decision regarding the requested service. Continued mental health residential treatment from 04/01/15 is not supported as medically necessary for the treatment of this member's condition based on medical necessity criteria.

38. Premera and NMR failed to identify who reviewed the independent review appeal, what his qualifications were, and failed to reference the specific terms in the Plan which supported their denial.

39. Premera failed to consider the substance of the information and arguments presented to Premera by Lyn in her appeal letters.

40. The denial of benefits for L.M.'s care after March 31, 2015 was a breach of contract and caused the M. family to incur and pay medical expenses that should have been paid by the Plan in an amount exceeding $80,000.

41. Lyn exhausted her appeal obligations under ERISA.

## CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

42. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators.  It sets forth a special standard of care upon a plan fiduciaries such as Premera, acting an agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan.  29 U.S.C. §1104(a)(1).

43. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process.  29 U.S.C. §1133(2).

44. Premera and the Plan breached their fiduciary duties to L.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in L.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of L.M.'s claims.

45. The actions of Premera and the Plan in failing to provide coverage for L.M.'s medically necessary treatment at Eva Carlston are a violation of the terms of the Plan and Premera's medical necessity criteria.

46. The actions of Premera and the Plan, as outlined above, have caused damage to Lyn and L.M., in the form of denial of payment for medical services provided to L.M. from April 1, 2015 through her discharge on June 16, 2016.

47. Premera and the Plan are responsible to pay L.M.'s medical expenses as benefits due

under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for L.M.'s medically necessary treatment at Eva Carlston under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 23rd day of October, 2017.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs


Plaintiffs' Residence:
New York City, NY